IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | Case No. 04 CR 361 |
| | ) | |
| VERNADO PARKER | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

The government indicted Vernado Parker, along with ten other co-defendants, for narcotics conspiracy, various substantive narcotics offenses, and using a telephone in furtherance of a drug trafficking offense. The charges derive in part from telephone conversations between Parker and co-defendants that were intercepted as a result of an order issued by then-Chief Judge Charles Kocoras under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2518, authorizing interception of communications to and from telephone numbers subscribed to by Parker and co-defendants Hector Manuel Lopez and Jessica Nevarez. The government intends to offer at trial electronic recordings of intercepted conversations involving Parker. Parker has moved to suppress evidence obtained via the wiretaps, contending that the government did not properly seal the recordings it obtained; failed to establish then-current probable cause in its March 2003 Title III application; failed to properly minimize what it recorded; and failed to establish necessity for its March 2003 and later intercepts as required by Title III. For the reasons set forth below, the Court denies Parker's motion to suppress.

**Facts**

In February 2002, the Bureau of Immigration and Customs Enforcement ("ICE") opened an investigation into what it believed was a large-scale drug organization that was receiving multi-kilogram quantities of cocaine from multiple sources in Mexico. ICE believed that the organization distributed cocaine throughout the United States. During the investigation, ICE identified several individuals whom it believed were supplying and distributing cocaine in the Chicago area and elsewhere. ICE also identified suspected wholesale customers.

To further its investigation, the government submitted applications with accompanying affidavits to then-Chief Judge Kocoras for authorization to intercept wire communications on a number of telephone lines. On July 11, 2002, Chief Judge Kocoras signed an order authorizing a wiretap for thirty days for two cellular telephones assigned to Lopez.[1] On August 16, 2002, Chief Judge Kocoras signed an order authorizing the wiretaps for another thirty days on these same two telephones as well as for another telephone registered to Lopez. On September 13, 2002, Chief Judge Kocoras signed an order authorizing the wiretaps for another thirty days for the three Lopez telephones as well as for another number registered to Lopez. In his September 13 order, Chief Judge Kocoras also authorized a wiretap for oral communications within a specified Chrysler van. The Drug Enforcement Administration ("DEA") arrested Lopez during this last wiretap authorization period, on September 18, 2002.

Following Lopez's arrest, the government obtained additional information from him to

---

[1] During the investigation, the telephone numbers assigned to these two cellular telephones changed, but the International Mobile Subscriber Identity ("IMSI") number remained the same. The IMSI number is encoded on a removable computer chip which may be placed in another similarly equipped telephone. The IMSI number is unique to each subscriber.

further its investigation. On March 20, 2003, the government submitted an application with accompanying affidavit to Chief Judge Kocoras for a wiretap on a telephone registered to Parker. In his affidavit accompanying the application, ICE agent Carl Hasler detailed the government's investigation and evidence regarding a drug trafficking conspiracy involving Lopez, Parker, and several other individuals. On March 20, 2003, Chief Judge Kocoras authorized the wiretap for thirty days. On April 23, 2003, he re-authorized the wiretap for another thirty days and authorized an additional wiretap for a telephone number that was registered to Nevarez. Chief Judge Kocoras authorized two more thirty-day wiretaps on both the Parker and Nevarez phones, the first on June 20, 2003 and the second on July 17, 2003.

Almost nine months later, on April 6, 2004, the government filed a criminal complaint charging Lopez, Parker, Nevarez and other co-defendants with conspiracy to distribute and to possess with intent to distribute more than five kilograms of mixtures containing cocaine, in violation of 21 U.S.C. § 846. A grand jury later returned an indictment against Parker and his co-defendants charging narcotics conspiracy, substantive narcotics offenses, and use of a telephone in furtherance of a drug trafficking offense.

## Discussion

**1.     Introduction**

Title III prohibits interception of wire and electronic communications unless authorized according to the requirements of the statute. 18 U.S.C. § 2511. The government must provide a sworn written application including a "full and complete statement" of the facts and circumstances claimed to justify issuance of an order to intercept communications. *Id.* § 2518(1). The government must also set forth "a full and complete statement as to whether or not

3

other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(1)(c). The government must also provide facts concerning all previous applications made to any judge for authorization to intercept communications involving any of the persons, facilities, or places described in the application. *Id.* § 2518(1). Before the judge can authorize interception, he must determine that there is probable cause to believe that a person is committing, has committed, or is about to commit an offense listed in 18 U.S.C. § 2516; there is probable cause to believe that communications regarding that offense will be obtained through the interception; normal investigative procedures have been tried and have failed or reasonably appear to be too dangerous or unlikely to succeed if tried; and there is probable cause to believe that the facilities from which the communications are to be intercepted are being or are about to be used in connection with the offense, or are listed to or commonly used by a person identified in the application. *Id.* § 2518(3).

2.  **Probable Cause**

The probable cause standard codified in Title III is equivalent to the Fourth Amendment standard. *See, e.g., United States v. Leisure,* 844 F.2d 1347, 1354 (8th Cir. 1988). Probable cause exists when the totality of the circumstances reveals a reasonable probability of criminal activity. *Illinois v. Gates,* 462 U.S. 213, 230-32 (1983); *United States v. Levy,* 990 F.2d 971, 973 (7th Cir. 1993). Title III requires that the government's application for a wiretap contain "facts sufficient to warrant a person of reasonable caution to believe that criminal activity is afoot and that evidence of that activity will be acquired via the intercept." 18 U.S.C. § 2518(3). The Court is required to review the application as a whole, not by dissecting it piecemeal. *Leisure,* 844

4

F.2d at 1354. The possibility of an innocent explanation for the activity described in the wiretap application does not negate the existence of probable cause, so long as the application reveals a reasonable probability of criminal activity. *Levy,* 990 F.2d at 973-74.

Parker contends the evidence the government offered in the March 20, 2003 application to support probable cause was stale because too much time had elapsed between the government's acquisition of the evidence and its submission of the application. The absence of staleness is not a separate element of a showing of probable cause. It is clear, however, that the age of the information supporting a warrant application is a factor that should be considered in determining whether there was probable cause to believe that evidence being sought would be obtained via the warrant – in this case, via the post-March 20, 2003 wiretap. *See, e.g., United States v. McNeese,* 901 F.2d 585, 596-97 (7th Cir. 1990); *see also, United States v. Spry,* 190 F.3d 829, 836 (7th Cir. 1999). "If the information is too old, it is considered stale and probable cause no longer exists." *McNeese,* 901 F.2d at 597 (citing *Sgro v. United States,* 287 U.S. 206, 210-12 (1932)).

It is undisputed that most of the information provided in the March 20, 2003 Title III application was six months old, or more, at the time. That by itself does not mean the information was too stale to support issuance of a Title III order. *See McNeese,* 901 F.2d at 597 (citing cases in which intervals of nine months and six months did not render the supporting evidence too stale to support a warrant). The question for the Court's determination is whether the information provided by the government in the March 20, 2003 application met Title III's requirement that there be facts sufficient to warrant a person of reasonable caution to believe not just that criminal activity had occurred in the past, but that criminal activity *was still* afoot and

5

that the requested intercept would uncover evidence of that activity. 18 U.S.C. § 2518(3).

Agent Hasler's affidavit included information that tended to show that Hector Lopez was involved in ongoing importation of cocaine from Mexico, which Lopez distributed to wholesale customers, who in turn distributed it to others. Information obtained by ICE and DEA agents indicated that Parker was one of Lopez's wholesale customers. This information included electronic surveillance and observation by agents that appeared to show, among other things, a transaction in late August 2002 in which Lopez distributed multiple kilograms of cocaine to Parker. Hasler reported that prior to that transaction, Parker had a series of telephone conversations that, though apparent coded language was used, appeared to concern an impending cocaine transaction. On August 28, 2002, Hasler stated, agents observed Parker meet with Lopez inside Lopez's van, leave the van, and enter a car driven by Keefe Peterson. The next day, after another Lopez - Parker conversation that appeared to involve a narcotics deal, agents observed Parker, driven by Peterson, travel to a location where Parker again entered Lopez's van and left the van carrying a large duffel bag.

Hasler's affidavit also reported a separate transaction in early August 2002 in which Lopez retrieved multiple kilograms of allegedly poor-quality cocaine from Mike Jones, another wholesale customer, and returned it to two of Lopez's suppliers, Pedro Castillo and Octavio Chamorro.

Hasler also summarized in his affidavit information obtained from cooperating witnesses. Hasler stated that Angel Figueroa, a convicted felon, was cooperating with government agents and reported that he had delivered multiple kilograms to a black man he knew as Alphonso Parker, whose nickname was "Rock" and who owned a Chicago restaurant called Paje. Hasler

6

also reported that Antonio Aguilera, who was under indictment for a narcotics offense, was also cooperating with government agents and stated, among other things, that for about two years, he had delivered multiple kilogram quantities of cocaine on Lopez's behalf to, among others, a black man he knew as "Rock" who owned a restaurant called Paje. Aguilera identified a photograph depicting defendant Parker as the man he knew as "Rock" and also identified Rock's phone number for the agents.

Hasler further stated in his affidavit that in mid-September 2002, DEA agents arrested Lopez in possession of forty kilograms of cocaine, and that in January 2003, Lopez submitted to an interview by government agents in the hope of gaining consideration for his cooperation, with the understanding that the information he provided could not be used against him directly. Lopez told the agents that he was distributing cocaine that he imported from Mexico to various persons, including Parker (whose nickname he said was "Rock" and who, he said, owned a restaurant called Paje). Lopez confirmed that in the August 2002 incident discussed earlier, he had delivered at least four kilograms of cocaine to Parker.

There is a colorable argument that the foregoing information, by itself, would have been insufficient to show probable cause to believe that a wiretap of Parker's telephones commencing in late March 2003 – which is what the government was requesting – would reveal incriminating information. First, all of the information just discussed concerned dealings that predated, by six months or more, the March 20, 2003 Title III application. Second, the application reflected that Lopez, Parker's apparent supplier, was already in custody – which might suggest that Parker lacked a source of supply and thus could not currently be engaged in cocaine dealing.

Hasler's affidavit also described, however, information that had been obtained in mid-

7

March 2003 that was sufficient for a person of ordinary caution to believe that Parker was still engaged in the same narcotics conspiracy, or at least an offshoot of that conspiracy. Specifically, Hasler stated that based on pen register analysis of Parker's cellular telephone, ICE agents learned that Parker had called Keefe Peterson four times the morning of March 15, 2003. A meeting then followed between Peterson, Parker, and others that appeared to ICE agents to fit the pattern of earlier apparent narcotics transactions involving Parker and Lopez.

The current information provided in Hasler's affidavit, together with the information obtained previously, was sufficient to establish probable cause under the Fourth Amendment and Title III and is sufficient to overcome Parker's staleness challenge. As the Seventh Circuit has stated, the "'[p]assage of time is less critical when the affidavit refers to facts that indicate ongoing continuous criminal activity.'" *Spry,* 190 F.3d at 836 (quoting *United States v. Pless*, 982 F.2d 1118, 1126 (7th Cir. 1992)). A person of reasonable caution could conclude, based on the totality of the information in the March 20, 2003 application, that Parker had been involved for years in a cocaine distribution conspiracy and was still engaged in that same activity even though his previous supplier was no longer in the business. It was also reasonable to believe, based on that information, that a wiretap of Parker's telephones would turn up further evidence of that activity.

**3.    Violation of the sealing requirement**

Parker contends that the government violated Title III's requirement that the original recordings of intercepted communications be sealed. 18 U.S.C. § 2518(8)(a). Specifically, Parker contends that the government violated this requirement because the agents did not deliver the hard drive buffer to the court, which Parker claims is the true original recording of the

8

intercepted conversations.

The primary purpose of section 2518(8)(a) is to "ensure the reliability and integrity of evidence obtained by means of electronic surveillance" and limit the government's "opportunity to alter the recordings." *United States v. McLee*, 426 F.3d 751, 764-65 (7th Cir. 2006). The statute requires the government to record any intercepted communications "on tape or wire or other comparable device" in such a way "as will protect the recording from editing or other alterations," and that the recordings must be made available to the judge issuing the surveillance order and sealed under his or her direction. *See* 18 U.S.C. § 2518(8)(a). The Seventh Circuit recently addressed this issue in *McLee*, a case where the government used newer technology in its wiretap investigation. *McLee*, 426 F.3d at 763-65.

In *McLee*, defendants argued that section 2518(8)(a) required the government to present the district court with the "original" recordings for sealing and that the recordings sealed in their case ran afoul of the statutory requirements because they were not the "originals." The Seventh Circuit reviewed the government's recording and sealing procedures in *McLee*, which involved storing audio by encoding three pieces of information (the session data, the actual audio, and the "pointers" or decoding map that the system can later use to decode the encoded audio portion) on a central hard drive buffer and then merging the information from the hard drive buffer onto a magneto-optical disk. The agents in *McLee* presented the magneto-optical disks to the district court for sealing pursuant to the statute. The defendants argued that section 2518(8)(a) required the government to deliver the hard drive buffer to the court for sealing because it was the true original recording of the intercepted call. The Seventh Circuit affirmed the district court's denial of defendants' motion to suppress, concluding that because the primary purpose of section

2518(8)(a) was to ensure the reliability and integrity of evidence obtained via electronic surveillance, and because the magneto-optical disks appeared to be the only secure and readable storage medium for the intercepted recordings, the disks constituted the proper evidence to be submitted for sealing under the statute.

The government contends in its response to Parker's motion that ICE agents used the same technology as the agents in *McLee*. Though the Court does not question the veracity of counsel, the problem is that the government's contention is unsupported by statements from those with direct knowledge of the technology used and what sealing procedures were followed. To put it another way, the government's recitation of the factual findings in *McLee* does not settle the issue in the present case. The government is directed to provide a supplemental submission addressing this point no later than October 16, 2006. The matter will be addressed further at the pretrial conference set for October 18, 2006.

**4.     Minimization**

Parker next claims that the government failed to comply with its statutory obligation to "minimize the interception of communications not otherwise subject to interception" under Title III. *See* 18 U.S.C. § 2518(5). Under the minimization requirement, "once the monitoring agent has had a reasonable opportunity to assess the nature of an intercepted communication, he or she must stop monitoring that communication if it does not appear relevant to the government's investigation." *United States v. Mansoori*, 304 F.3d 635, 646 (7th Cir. 2002). A court assesses the government's compliance with this requirement by reviewing whether the agents took objectively reasonable steps to minimize the interception of communications unrelated to the investigation, given the particular circumstances they confronted. *See Scott v. United States*,

436 U.S. 128, 137 (1978). Relevant factors include the nature of the criminal activity being investigated; the thoroughness of any efforts to ensure that nonpertinent calls will be minimized; the foreseeability that certain types of conversations would be innocuous and thus subject to minimization; use of code; and the extent to which the authorizing judge oversaw the interception efforts. *Mansoori*, 304 F.3d at 647.

Parker argues that the government did not follow its statutory duty to minimize intercepted conversations. He bases his contention on his analysis of the periodic ten-day reports that the government provided to the district court during the course of the thirty-day interception period. Specifically, Parker contends that the small proportion of calls that were minimized translates to a finding that the government did not comply with its statutory obligation. Parker does not direct the Court to any specific instances where he believes the government failed to properly minimize.

Though Parker is correct that the government intercepted an enormous number of phone calls, his argument does not take into account the average length of the calls. The vast majority of intercepted phone calls were less than two minutes in length. The Seventh Circuit has held that two to three minutes is a reasonable interval within which agents monitoring an interception may make an initial judgment as to the pertinence of a conversation. *See Mansoori*, 304 F.3d at 647. The court in *Mansoori* explained that if an intercepted phone call is short, then the agents monitoring the wiretap need not minimize the call, because the agent's ability to "make quick assessments of the pertinence of a conversation [is] difficult." *Id.* at 645-46.

The alleged conspiracy involved in the investigation in the present case was wide-ranging and included participants from all over the United States and Mexico, many of whom spoke in

11

apparently coded language. This factor, together with those discussed in *Mansoori*, weighs in favor of giving the monitoring agents a reasonable degree of latitude in carrying out their obligation to minimize. *Id.* at 647. Based on the material presented, the government did not run afoul of the statutory minimization requirement.

Even were Parker to prevail on his minimization challenge, the appropriate relief likely would be to suppress any conversation that was inappropriately monitored. *Id.* at 648. But Parker fails to identify a single call involving him that he believes should have been minimized but was not, instead relying on his blanket challenge. Because the Court has concluded that Parker's blanket challenge lacks merit, we decline to order suppression on this basis.

**5.     Necessity**

Parker also challenges the wiretaps authorized in March 2003 and thereafter on the ground of lack of necessity. He argues that the government already had enough evidence of criminal activity in August 2002 to bring an indictment against him.

As discussed earlier, a judge reviewing a Title III wiretap application must determine whether "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). The statutory requirements are set forth in the alternative, meaning that the government need only establish one of the three. *United States v. Fudge*, 325 F.3d 910, 918 (7th Cir. 2003).

The purpose of the necessity requirement is to ensure that wiretapping is not used as the initial step in a criminal investigation. *United States v. Giordano*, 416 U.S. 505, 515 (1974). But this does not require the government to use wiretaps "only as a last resort." *United States v. Thompson*, 944 F.2d 1331, 1340 (7th Cir. 1991). Thus, the government need not show that it has

12

exhausted all other investigative avenues. Rather, it must demonstrate "only that the success of other methods of investigation appear unlikely." *Id.*

The Seventh Circuit addressed a similar argument in *Fudge*, where the government used a wiretap for several reasons, including to obtain more incriminating evidence. *Fudge*, 325 F.3d at 919. In analyzing the government's compliance with the necessity requirement, the Seventh Circuit did not find fault with the government's motivation to continue a wiretap to obtain more incriminating evidence for the investigation. *Fudge*, 325 F.3d at 919.

As in *Fudge*, the history of the wiretaps used in the present investigation reflects that the government continued the wiretap to obtain more evidence regarding key figures in the alleged conspiracy. In his March 20, 2003 affidavit, agent Hasler explained that the government employed several of the normal investigative procedures in this case before applying for a wiretap. Specifically, Hasler stated that the government used physical surveillance, undercover agents, confidential informants, and cooperating sources. Hasler stated that the agents needed to use electronic surveillance because the organization's meeting places were constantly changing or were not agreed upon until shortly before a meeting was to occur. Further, the alleged conspirators began using counter-surveillance techniques, such as erratic driving behavior and individuals guarding Parker during his meetings with other alleged co-conspirators, indicating that they suspected law enforcement surveillance was being used against them. Hasler explained that if the intensity of the physical surveillance were to be increased, the result might be a pause of the organization's illegal activities or a change in the organization's methods at a critical point in the investigation. Hasler asserted that the government needed to continue investigating because it could not identify certain suppliers and distributors in the conspiracy, and the wire

13

communications were expected to yield information regarding the nature, extent, and methods of the operation as well as the identities of yet-unknown co-conspirators, their accomplices, aiders, and abettors.

The government established its burden of showing that normal investigative techniques reasonably appeared unlikely to succeed. Courts have upheld the necessity for wiretaps on the basis that investigators were "having trouble fingering other members of the conspiracy." *See United States v. Farmer*, 924 F.2d 647, 652 (7th Cir. 1991). Further, the Seventh Circuit has upheld wiretaps to "allow[] the government to ascertain the extent and structure of the conspiracy." *McLee*, 436 F.3d at 763 (citing *United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995)).

Finally, Parker suggests that the extension affidavits failed to establish necessity because they contain boilerplate repetitions of the original affidavits. Parker argues, in essence, that an extension affidavit fails to demonstrate necessity if it merely duplicates the content of the initial affidavit. It is true that an extension affidavit must establish the necessity of ongoing surveillance, but it need not set forth wholly new or different information from what was presented in the original application. *See, e.g., United States v. Merton*, 274 F. Supp. 2d 1156, 1169 (D. Colo. 2003) (finding that an extension application that relied on certain new information, as well as information from a previous affidavit, satisfied the requirements of section 2518(1)(c)). Often duplication is unavoidable when the basis for necessity remains unchanged over the course of an investigation. In its extension applications, the government submitted affidavits containing certain new information gleaned from its continued physical and wire surveillance of Parker. In sum, the Court finds that the extension affidavits in this case did

14

not fail to comply with the necessity requirement by duplicating the content of the original affidavits.

**Conclusion**

For the reasons stated above, the Court denies in part defendant Parker's motion to suppress the Title III wiretaps [docket no. 231]. The issue of proper sealing remains for determination, as discussed in the body of this decision.

                                                    MATTHEW F. KENNELLY
                                                    United States District Judge

Date: October 10, 2006